## WEED v. LYONS PETROLEUM CO.

(District Court, D. Delaware. November 14, 1923.)

No, 7.

1. **Appeal and error ⚌1052(4)—Error in admitting contract without sufficient authentication may be cured by subsequent proof.**

Error in admitting a contract in evidence without sufficient proof that it is the contract of defendant is cured by subsequent introduction of evidence establishing that fact.

2. **Corporations ⚌408—Contract of sale of stock made by officers held binding.**

A contract for sale of treasury stock by a corporation, signed on its behalf by the vice president, with the approval of the president, the two being the organizers of the corporation and original owners of all its stock, except sufficient to qualify directors, and at all times in full control of its affairs, *held* the contract of the corporation, in the absence of proof by it that under its charter and by-laws such officers were without power to make it.

3. **Contracts ⚌16—Acceptance of offer creates bilateral contract.**

A written offer, on its acceptance in writing by the optionee, ceases to be an option, and becomes a bilateral contract.

4. **Contracts ⚌9(1)—Contract for sale of shares of stock held not void for uncertainty.**

A contract by a corporation for sale of a certain number of shares of its treasury stock at stated prices *held* not void for uncertainty, because of a further provision that the stock should be held in escrow, without naming the depository or the length of time of the escrow.

5. **Contracts ⚌9(1)—Uncertainty of one provision does not necessarily invalidate entire contract.**

Though one or more several promises be invalid for uncertainty, the contract will usually be given effect, if a consideration still remains.

6. **Contracts ⚌9(1)—Not invalid for uncertainty if intention of parties can be ascertained.**

A contract will not be held invalid for uncertainty, unless the meaning and intention of the parties cannot be ascertained.

7. **Contracts ⚌313(1)—Renunciation by one party excuses preparation for and tender of performance by the other.**

Where a contract has been renounced by one party before the time for performance, the other party is excused from tender of performance and from preparing to perform, and need only show his readiness, willingness, and ability to perform.

8. **New trial ⚌72—Not ground for new trial that verdict is against preponderance of evidence.**

It is not sufficient ground for new trial that the verdict is merely against a preponderance of the evidence, or that the court might have arrived at a different result; but the verdict must be manifestly and palpably against the evidence in the case.

⚌For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**9. Damages ⬡⟐1—Basic measure is just compensation.**

The fundamental measure of damages is just compensation for the loss sustained.

**10. Damages ⬡⟐62(1)—Duty of party injured to minimize.**

The party injured is under an affirmative duty to use reasonable care and diligence to avoid loss, or to minimize the resulting damages.

**11. Sales ⬡⟐418(2)—Measure in action by purchaser for breach of contract.**

In an action by a purchaser for breach of contract, where delivery and payment are to be concurrent acts, and there is an available market where the goods can be bought and sold, the general rule is that plaintiff is entitled to recover as damages the difference between the contract price and the fair market value at the time and place of delivery, with interest. In the absence of an available market, in which the purchaser can supply himself, the measure of damages is the difference between the contract price and the actual value.

**12. Sales ⬡⟐418(2)—Only fair and open market can furnish basis for computation of damages; "available market."**

An "available market," to furnish a basis for the measure of damages, must be a fair and open market in which prices are not manipulated.

**13. Sales ⬡⟐418(3)—"Market price" defined, under rule as to recovery of damages, where payment and delivery are concurrent, and there is an available market.**

Under the rule that, in suits by purchaser against seller for breach of contract of sale, where payment and delivery are to be concurrent acts, and there is an available market where the goods can be bought and sold, the damages will be the difference between the contract price and the market price at time and place of delivery, by the "market price" is meant the fair value as between one who desires, but is not compelled, to buy, and one who is willing, but not compelled, to sell, not what could be obtained for like property under peculiar circumstances when a price greater or less than its fair price could be obtained, nor a speculative value, nor a price obtained in a manipulated or stimulated market, nor a value obtained from the necessity of the seller to sell or the buyer to buy, but value at a sale which a prudent owner would make if he had the power of election as to the time and terms.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Market Price.]

At Law. Action by Harold K. Weed against the Lyons Petroleum Company. On motion for new trial. Denied.

Charles F. Curley (of Saulsbury, Curley & Davis), of Wilmington, Del., and Joseph A. Seidman, of New York City, for plaintiff.

James I. Boyce, of Wilmington, Del., O. D. Batchelor, of New York City, and C. F. Carnine, of Denver, Colo., for defendant.

MORRIS, District Judge. A verdict for $30,800 having been rendered in favor of Harold K. Weed in his suit against Lyons Petroleum Company, the latter now moves for a new trial. The verdict represents the amount of damages assessed against the defendant for its failure and refusal to deliver to Weed the 87,000 shares of its treasury stock specifically called for by the following contract:

"October 26, 1921.

"H. K. Weed, 347 Madison Ave., New York City—My Dear Mr. Weed: In accordance with our conversation to-day, we agree to sell you 67,000 shares treasury stock at 50 cents a share, and 20,000 shares treasury stock at 70 cents a share, same to be paid for at the above-stated prices on or before

January 2, 1922. In the event that such shares are paid for and delivered, they are to be held in escrow until released by mutual agreement. Furthermore, until Saturday, October 29, noon, we agree to accept all sales made by you and paid for on a basis of 50 cents per share. Your signature affixed hereto is an acknowledgment of your acceptance of this agreement.

"Very truly yours,       Lyons Petroleum Company,

"[Signed]   C. S. Downing, Vice President.

"Accepted: [Signed]   H. K. Weed."

The reasons advanced by the defendant in support of its motion are: (1) That the contract was admitted in evidence upon insufficient proof that it was the contract of the defendant; (2) that the court should have directed a verdict for the defendant; (3) that the verdict was against the weight of the evidence; (4) that the verdict was for excessive damages; and (5) that the verdict was against the law. The more important grounds upon which the defendant sought a directed verdict were: (a) That there was not sufficient proof to go to the jury that the contract was the contract of the defendant; (b) that in any event it is merely an option, lacking consideration to support it and is therefore void; (c) that it is likewise void for uncertainty; and (d) that there was no sufficient proof that the plaintiff tendered performance, or was ready, willing, and able to perform his part of the agreement.

[1, 2] Inasmuch as any error in admitting the contract in evidence without sufficient proof of its being the contract of the defendant was cured if, after its admission, evidence was admitted amply sufficient to establish that fact (City of Anthony v. Woonsocket Institution for Savings, 71 Fed. 97, 17 C. C. A. 622; Swenson v. Bender, 114 Fed. 1, 51 C. C. A. 627), the first above mentioned reason for a new trial becomes merged in subdivision (a) of the second reason, namely, that there was not sufficient proof to go to the jury that the contract was the contract of the defendant, and needs no separate consideration. A re-reading of the entire record for the purposes of the pending motion has convinced me that the evidence upon this point was not only sufficient to be submitted to the jury, but is so overwhelming that it admits of but one conclusion—that of the jury.

The corporation was formed in December, 1919, with a capitalization of 3,000,000 shares, of the par value of $1 each, for the purpose of purchasing the Oklahoma oil properties of James G. Lyons. Defendant's Exhibits Nos. 1 and 3. Lyons and Downing were the two men who organized the company. Lyons' property was transferred to the company, apparently, in consideration of the full amount of the authorized capital stock. On January 12, 1920, two agreements were entered into with respect to the stock (Defendant's Exhibit No. 2 and Plaintiff's Exhibit No. 7); the former between the defendant company, Lyons, and Downing of the first part, Weed, Edwards & Co., of which the plaintiff herein was president, of the second part, and Lawyers' Title & Trust Company of New York, of the third part. It recites the agreements of December 10 and 23, 1919 (Defendant's Exhibits Nos. 1 and 3), for the purchase by Weed, Edwards & Co. of 1,200,000 shares of the capital stock of the defendant company; the appointment of Lawyers' Title & Trust Company as the deposi-

tory of the stock pending the consummation of the purchase; the receipt of the stock by the trust company being acknowledged. The defendant company, Lyons, and Downing agreed to sell, and Weed, Edwards & Co. agreed to buy, the 1,200,000 shares of stock at the price of 50 cents per share, to be paid for in installments ending August 15, 1921. The trust company was authorized to deliver to Weed, Edwards & Co. 2 shares of the stock held by it for each dollar paid. The contract was to terminate and become null and void if Weed, Edwards & Co. became in default for 60 days.

The other contract of January 12, 1920 (Plaintiff's Exhibit No. 7), was between the defendant company, Lyons, and Downing, of the first part, and Weed, Edwards & Co., of the second part. It recited the agreement with respect to the 1,200,000 shares; that "the parties of the first part own and hold all of the shares of the capital stock of said corporation, other than qualifying shares held by the directors of said corporation, namely, 7 shares." It provides that the parties of the first part shall deposit with the Citizens' National Bank of Okmulgee, Okl., as trustee, 1,799,993 shares of the capital stock of defendant to be held as therein provided, the purpose being to keep those shares off the market so long as Weed, Edwards & Co. performed its contract with respect to the 1,200,000 shares. On April 12, 1920, the rights of Weed, Edwards & Co., a Delaware corporation, were acquired by a New York corporation of the same name, and new contracts were executed. A still further agreement changing the price to 75 cents per share was entered into on November 16, 1920. Plaintiff's Exhibit No. 1. On September 14, 1921, the price was again reduced to 50 cents per share, and the trust company was notified accordingly. Plaintiff's Exhibit No. 2 and Defendant's Exhibit No. 6. Up to October 26, 1921, the only stock sold was that sold under the Weed, Edwards & Co. contracts. On the last mentioned day the Lawyers' Title & Trust Company held on deposit, under the terms of the agreement of November 16, 1920, 290,450 shares; on November 1, 1921, it had 169,750 shares, which remained on deposit with it until May 1, 1922. "The Lyons Petroleum Company was and always was Mr. Lyons and Mr. Downing; no one else." "You mean those two men largely controlled it?" "Did control it." Lyons "directed the affairs of the Lyons Petroleum Company with reference to its finances and with reference to its field operations." From the beginning Lyons attended to the field operations in Oklahoma. Downing remained in New York, taking care of the New York business of the corporation. Downing "was looking after the marketing of the Weed-Edwards stock"—"the main business of the corporation in New York for a year preceding December 1921." He "was in charge of the stock operations in New York City." The contracts with Weed, Edwards & Co., to which the corporation's seal was affixed, attested by the secretary, were signed on behalf of the defendant by Lyons. Weed, says Lyons, "was familiar with every act of the officers of the corporation," "and was just as familiar with the situation as I was." Weed says, "I am quite sure that no formal meetings (of the board of directors) were held." During October, 1921, Lyons became de-

sirous of supplanting the Weed, Edwards & Co. contract of November 16, 1920 (Plaintiff's Exhibit No. 1), as modified September 14, 1921 (Plaintiff's Exhibit No. 2; Defendant's Exhibit No. 6), by a contract with Ehrich Company. To do this it was necessary to eliminate the Weed-Edwards contract. On October 24th Lyons sent to Downing the following telegram (Defendant's Exhibit No. 13):

"Okmulgee, Oklahoma, October 24th, 1921.

"Chas. S. Downing, 100 West 59th Street, New York City, N. Y. Ehricks proposition satisfactory subject to our approval contract in written form subject to confining within bounds of following instructions: Instruction No. 1, Weed-Edwards proposition, must be disposed of in an equitable manner and to their liking as well as our own. We cannot arbitrarily cut loose from them by notifying the bank to make no further delivery of stock. This course will only be the beginning of a misunderstanding which might seriously retard progress any new transaction. Discuss the proposition forcibly, but candidly, with Weed, and arrive at some definite understanding Tuesday. It would be a serious mistake to junk the good will and friendly relation-. ship existing between Weed Edwards and ourselves. Hence the advisability of a peaceable termination of our business relationship. Instructions Number two New Ehrick contract to terminate without further notice on expiration of specified sixty days or on the thirty days first specified in event of default of commitment. Instructions number three All bonus stock and stock owned by insiders or officers of company must be continued in escrow in the Citizens National Bank under some equitable contract satisfactory to all of us. Do not see the necessity of employing New York attorney at this time. Have Ehrick submit contract to us. Have Ehrick's attorney draw up contract based on your mutual understanding same to be forwarded here for approval our attorneys. Keep me advised daily progress.

"James G. Lyons."

Downing replied (Defendant's Exhibit No. 7), October 26th, thus:

"New York, Oct. 26, 1921.

"James G. Lyons, Okmulgee, Okla. Contract with W. E. canceled by mutual consent as of noon Saturday October twenty ninth. Have agreed to give Weed personally option to January second on sixty seven thousand shares at fifty cents and twenty thousand shares and [at] seventy cents. This is necessary to sever connections amicably which has been done. In the event option is exercised stock is to be held in escrow until released by mutual agreement. Have entered into an agreement with Ehrich and Company as follows: One We sell them outright six thousand shares at twelve and a half cents per share this contemplates the delivery of five thousand bonus stock to them and the sale of one thousand shares at seventy five cents under their first option. Two is a direct option at seventy five cents for thirty five days from October twenty sixth on one hundred thousand shares. Three is an option at ninety cents a share for sixty five days from October twenty-sixth on one hundred thousand shares. Both of these options are subject to immediate cancellation on expiration date and nonfulfillment. Four is an agreement we not to sell stock during the life of their option and also to make arrangements with W. E. to tie up for a period of sixty days any stock owned by them. We agree that with each five thousand shares of stock taken up and paid for by them we give them a bonus of two hundred fifty shares. They stipulate agreements must be signed Thursday in order to take up their market preparations where W. E. leave off. They will accept my individual signature. Authorize same by wire tonight. Inasmuch as W. E. contract does not expire until Saturday noon and we have no means of knowing the amount of stock remaining unsold on their contract it is advisable that you send the Trust Company for receipt not later than Saturday noon two hundred thousand shares with the proper resolution authorizing its delivery to Ehrich and Company on the payment of seventy five cents per share for the first hundred thousand shares and ninety cents per share on the second hundred

thousand shares. In order to facilitate delivery of all bonus stock suggest that you authorize Trust Company to issue on my order fifteen thousand shares in addition to the two hundred thousand shares and I will make delivery to Ehrich of five thousand shares at once and balance as bonus is earned. On Saturday noon I will notify the trust company to return to the company the balance of unsold stock under the W. E. contract. The above is all in accordance with my previous wires and your instructions on which I have closed the deal.      ' C. S. Downing."

There is no evidence that action of the board of directors was had or was necessary to enable Lyons, through Downing, to make a contract for the Lyons Petroleum Company with Ehrich Company. There is no suggestion that Lyons' acting through Downing was without power to cancel by mutual agreement on October 26th the Weed, Edwards & Co. contract. The defendant merely denies the power of Lyons & Downing to do that which was incidental and necessary to the cancellation of that contract, namely, enter into the contract in suit. It is difficult to conceive that Lyons would create a corporation to hold his properties, become the president of the corporation, and yet fail to see to it that as president he had powers broad enough to deal with treasury stock of the company. The defendant did not put in evidence the record of the company, such as the by-laws, prescribing the powers of the president. Why? The presumption is that the suppressed documentary evidence, the best evidence of Lyons' actual power or lack of it, would have been detrimental to the defense that the contract in suit was not the contract of the defendant. Clifton v. United States, 4 How. 242, 247–8, 11 L. Ed. 957; Runkle v. Burnham, 153 U. S. 216, 225–226, 14 Sup. Ct. 837, 38 L. Ed. 894; Atty. Gen. v. Queen's Free Chapel, 24 Beav. 679, 706, 53 Reprint 520; Doherty v. Youngblut, 71 Colo. 30, 204 Pac. 85; 10 R. C. L. 889.

But, says the defendant, Lyons did not expressly authorize Downing to enter into a contract with Weed. Assuming, but not conceding, this contention to be sound, yet Downing advised Lyons he had done so. The defendant, however, asserts that Lyons was advised that Downing had given Weed merely an option and that, if the contract is not an option, but a bilateral contract, Lyons lacked the full facts necessary to an acquiescence in Downing's act. I think this contention unsound. An option would have obligated the defendant to sell to Weed, at his election, the 87,000 shares of stock upon the terms and conditions specified. James on Option Contracts, § 101. The power of Weed to call for performance was just as great under an option as under a bilateral contract. If an option the right of election was his, not the defendant's. By the exercise of that right Weed could at any moment have converted the option, if option it was, into a bilateral contract. Knowledge on the part of Lyons as to whether Weed had elected to take the shares was without bearing upon the acquiescence of Lyons in Downing's act in binding the defendant to sell the shares to Weed. Moreover on December 7, 1921, Lyons saw the contract. Yet it was not until after this suit was brought that the defendant sought to repudiate the contract. Whether viewed from the standpoint of apparent authority, actual authority, or acquiescence, I think the evidence warrants no conclusion other than that the contract in suit is the contract of the defendant.

[3] I think defendant's next contention—that the contract in suit is merely an option, lacking consideration to support it, and is therefore void—is likewise unsound. If it lacked consideration before acceptance it was at least an offer. James on Option Contracts, §§ 101, 103, 301. The offer was not withdrawn. It was accepted by Weed immediately after its execution by the defendant. Whatever it may have been during the instant intervening between Downing's signature and Weed's acceptance is immaterial, for upon Weed's acceptance it was converted into a bilateral contract. Thereafter the rights and liabilities of the parties were to be measured by the rules applicable to bilateral contracts, and not by the rules peculiar to options or offers. James on Option Contracts, §§ 719, 817.

[4] Is the contract void for uncertainty? The stipulation contained in the first sentence with respect to 87,000 shares of stock is clear, definite, and certain. That is not disputed. But, says the defendant, the stipulation of the second sentence is uncertain both as to the depository in whose hands the stock was to be placed in escrow and as to the time the stock was to be held in escrow. For the transfer of the stock Weed promised to do two things—pay the money specified, and place the stock in escrow. The former promise is definite, certain, and legal. Assuming the latter promise to be invalid for indefiniteness, the former is, I am inclined to think, sufficient to uphold and give effect to defendant's promise to sell. The valid promise is obviously separable from the invalid.

[5] Though one or more severable promises be invalid, the contract will usually be given effect if a consideration still remains. McCullough v. Virginia, 172 U. S. 102, 114, 19 Sup. Ct. 134, 43 L. Ed. 382; Montanua v. Buschmeyer, 158 Ky. 53, 164 S. W. 802; Larsen v. Johnson, 78 Wis. 300, 47 N. W. 615, 23 Am. St. Rep. 404; Tuttle Bros. & Bruce v. City of Cedar Rapids, 176 Fed. 86, 99 C. C. A. 606; Western Union Telegraph Co. v. R. & S. W. Ry. Co. (C. C.) 11 Fed. 1. But absolute certainty is not required. A contract too uncertain to be specifically enforced in equity may be sufficiently definite to support an action for damages. Worthington v. Beeman, 91 Fed. 232, 33 C. C. A. 475.

[6] Moreover, the law leans against the destruction of contracts on the ground of uncertainty and a contract will not be held invalid on that ground unless the meaning and intention of the parties cannot be ascertained. Elliott on Contracts, § 170. There is nothing in the clause in question to indicate that the defendant was interested in who should act as the depositary. A reading of the clause in question makes it clear that the defendant was interested in having the stock in escrow, and not in the identity of the depositary. Weed was to pay the full purchase price before receiving the stock. While in escrow the stock would be his—not the defendant's. Under such circumstances a reasonable inference, I take it, is that Weed should select the depositary. The requirement that the stock should be held in escrow "until released by mutual agreement," I think, may not reasonably be held to mean that the defendant could arbitrarily refuse to consent to the release of the stock after all reasons for its

being so held had ended. Hence a reasonable interpretation would be that the defendant impliedly undertook to agree to its release at the expiration of a reasonable time under all the circumstances. Thus construed the escrow clause of the contract is not void for uncertainty.

[7] Ordinarily, if either party would enforce his contract against the other, he must do more than show the other's default; he must show a performance, or an offer to perform, on his part, or, under different circumstances, that he was ready, able, and willing to perform at the time and place appointed. Greenwood v. Watson, 171 Fed. 619, 96 C. C. A. 421; Neis v. Yocum (C. C.) 16 Fed. 170; Magna Oil & Refining Co. v. White Star Refining Co. (C. C. A.) 280 Fed. 52, 57. But the law is founded upon reason, and so does not require the doing of a vain act. Consequently it recognizes that a tender of performance may be waived by the conduct of a party to whom such tender would otherwise have to be made. If the law stopped there, no matter what the conduct of the other party might be, it would fail to give to some combinations of circumstances their natural and reasonable consequences. Hence the law provides that, if formal acts are essential to constitute "readiness," the plaintiff may be as clearly excused by the conduct of the other party from acts of *preparation* as of performance; that the degree of preparation for performance varies with the circumstances; that where the other party, prior to the expiration of the time appointed for performance, refuses to perform his covenants, a want of entire and absolute preparation by the plaintiff is excused, and that under such circumstances an allegation of readiness, willingness, and ability to perform means only that the plaintiff was disposed and would have been able to perform the contract on his part, if it had not been renounced by the defendant. Smith v. Lewis, 24 Conn. 624, 63 Am. Dec. 180. See, also, Crist v. Armour, 34 Barb. (N. Y.) 378, and Lowe v. Harwood, 139 Mass. 133, 29 N. E. 538.

In the case at bar the plaintiff knew that all the shares of treasury stock of the defendant were on deposit with a trust company, and that some arrangement would have to be made by the defendant with the trust company to enable the plaintiff to obtain them. He made arrangements to borrow the money necessary to pay for the shares. Thereafter, on December 20th, almost two weeks before he was required to tender performance under the contract, but before getting the money into his possession, he called upon Downing, advised him that he (the plaintiff) had made arrangements to take up his stock, and requested that the defendant make the necessary arrangement with the trust company to enable him to obtain it. Thereupon Downing refused, as Lyons had theretofore refused, to carry out the contract unless Weed should perform an act foreign to and not a part of the contract. This amounted to a definite refusal on the part of the defendant to perform on its part. Thereby the plaintiff was excused from taking into his manual possession the money he had planned to borrow. By showing these facts, the plaintiff established, not only that he was disposed to perform, but that he was financially able and as completely prepared to perform as the law, under the circumstances, required him to be.

The difference in the nature of the judicial function upon a motion for a directed verdict for want of evidence and upon a motion for a new trial on the ground that the verdict is against the weight of the evidence was thoroughly considered in Mt. Adams v. Lowery, 74 Fed. 463, 20 C. C. A. 596, and in Felton v. Spiro, 78 Fed. 576, 24 C. C. A. 321. Judge Taft in the latter case, quoting from the opinion of Judge Lurton in the former, said:

"We do not think, therefore, that it is a proper test of whether the court should direct a verdict, that the court, on weighing the evidence, would, upon motion, grant a new trial. A judge might, under some circumstances, grant one new trial and refuse a second, or grant a second and refuse a third. In passing on such motions, he is necessarily required to weigh the evidence, that he may determine whether the verdict was one which might reasonably have been reached. But, in passing upon a motion to direct a verdict, his functions are altogether different. In the latter case we think he cannot properly undertake to weigh the evidence. His duty is to take that view of the evidence most favorable to the party against whom it is moved to direct a verdict, and from that evidence, and the inferences reasonably and justifiably to be drawn therefrom, determine whether or not, under the law, a verdict might be found for the party having the onus. If not, he should, upon the ground that the evidence is insufficient in law, direct a verdict against that party."

[8] It is not, however, a sufficient ground for a new trial that the verdict is merely against a preponderance of the testimony, or that the court might have arrived at a different result, but the verdict must be manifestly and palpably against the evidence in the case. 20 R. C. L. 274. An examination and consideration of the entire record, however, have only served to confirm the impression gained at the trial, namely, that the verdict is sustained by the great weight of the evidence.

[9] Was the verdict excessive? The universal principle with respect to damages is that the person injured shall receive a compensation commensurate with his loss, and no more, and that it is the right of the person bound to pay such compensation not to be compelled to pay more, except costs. 1 Sutherland on Damages, 47. At page 48 the author says:

"The principle of just compensation is paramount. By it all rules on the subject of compensatory damages are tested and corrected. They are but aids and means to carry it out; and when in any instance such rules do not contribute to this end, but operate to give less or more than just compensation for actual injury, they are either abandoned as inapplicable or turned aside by an exception."

[10, 11] Another fundamental rule of like universality, to be coordinated and applied with the foregoing principle, is that there can be no recovery for losses which reasonable efforts of the party injured might have prevented. He is under an affirmative duty to use reasonable care and diligence to avoid loss, or to minimize the resulting damage. 8 R. C. L. 442. In suits by a purchaser against the seller for a breach of the contract of sale, the general rule is, where payment and delivery are to be concurrent acts, and there is an available market in which the goods may be readily bought and sold, that the purchaser is entitled to recover as damages the difference between

the contract price and the market value of the goods at or about the time and place appointed for delivery and interest. 2 Sutherland on Damages, p. 2273. This rule is founded on the consideration that the articles withheld are worth the market price to the seller, and the purchaser may immediately after the breach of the contract go into the market and supply himself at the market price, and thus put himself in as good condition as if the contract had been performed. 2 Sutherland on Damages, pp. 2279, 2280.

[12] Under such rule, market price means the fair value as between one who desires, but is not compelled, to buy, and one who is willing, but not compelled, to sell, not what could be obtained for like property under peculiar circumstances when a price greater or less than its fair price could be obtained, nor a speculative value, nor a price obtained in a manipulated or stimulated market, nor a value obtained from the necessity of the seller to sell or the purchaser to buy, but its value at a sale which a prudent owner would make, if he had the power of election as to the time and terms. Madisonville, H. & E. R. Co. v. Ross, 126 Ky. 138, 103 S. W. 330, 13 L. R. A. (N. S.) 420; 2 Sutherland on Damages, pp. 2297, 2298. In order for the market price rule truly to reflect and measure plaintiff's loss, obviously there must be an available market. Such a market was described by the Court of Appeals for this circuit in Wilmoth v. Hamilton, 127 Fed. 48, 53, 61 C. C. A. 584, as one "in which the purchaser can supply himself." In the absence of such a market, the measure of damages is the difference between the actual value of the article and the contract price at or about the time it should have been delivered under the contract. 8 R. C. L. 488.

[13] The evidence in the case is that the capital stock of the defendant was sold on the New York Curb. There is much evidence, however, that it was not there sold in such quantities as would have enabled the plaintiff to supply himself with 87,000 shares within a reasonable time after defendant's breach. There is much other evidence that the market was stimulated and manipulated. Plaintiff's Exhibit 10; Defendant's Exhibit 10. The quotation in such a market would not be a "market price" as defined by law. Under the law and facts the jury was fully justified in concluding that there was no available market in which the plaintiff could have supplied himself at the "market price," and in rendering a verdict for the difference between the actual value of the stock and the contract price. The evidence fully supports the value placed upon the stock by the jury. Plaintiff's Exhibit 12. Its verdict was not excessive.

In view of what has been heretofore said, the last ground urged by the defendant in support of its motion for a new trial—that the verdict was against the law—needs no special or further examination.

The motion for a new trial must be and is denied.