### DE BLOIS et al. v. COMMISSIONER OF INTERNAL REVENUE.

Circuit Court of Appeals, First Circuit. November 22, 1929.

No. 2346.

Burton E. Eames, of Boston, Mass. (Tyler, Eames, Wright & Hooper, of Boston, Mass., on the brief), for petitioners.

Percy S. Crewe, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C. (Mabel Walker Willebrandt, Asst. Atty. Gen., C. M. Charest, General Counsel, Bureau of Internal Revenue, of Washington, D. C., and Sewall Key and Helen R. Carloss, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before BINGHAM, ANDERSON, and WILSON, Circuit Judges.

ANDERSON, Circuit Judge. This is a petition for review of a decision by the United States Board of Tax Appeals, sustaining the Commissioner of Internal Revenue in holding the estate of David Sears, of which the petitioners are executors, liable to an additional tax of $15,216.09 for 1920. The question involved is the right to a deduction of $26,297.10, claimed as a loss sustained in 1920 in connection with Mr. Sears' purchase of 366 shares of the preferred stock ($100 par) of the Massachusetts Electric Companies at a cost of $29,224.12, having a market value on March 1, 1913, of $27,816. An immaterial difference appears in the computations of counsel.

The Massachusetts Electric Companies was a voluntary association, owning all the common and part of the preferred stock, and some of the notes, of the Bay State Street Railway. Under the reorganization (hereinafter sketched) Sears deposited his 366 shares with the reorganization managers, paid them $10 a share on his 366 shares ($3,660), and received in the new Eastern Street Railway Company an allotment of bonds and other securities, having a total par value of $23,424 and a market value in 1920 of $5,398.50. The result is claimed as a deductible loss.

The only issue in this case is whether the transaction under which this loss was sustained is within the provision of section 202 (a) and (b) of the Revenue Act of 1918, 40 Stat. 1057, 1060; so that the loss cannot be recognized. This reads as follows:

"Sec. 202. (a) That for the purpose of ascertaining the gain derived or loss sustained from the sale or other disposition of property, real, personal, or mixed, the basis shall be—

"(1) In the case of property acquired before March 1, 1913, the fair market price or value of such property as of that date; and

"(2) In the case of property acquired on or after that date, the cost thereof; or the inventory value, if the inventory is made in accordance with section 203.

"(b) When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any; but when in connection with the reorganization, merger, or consolidation of a corporation a person receives in place of stock or securities owned by him new stock or securities of no greater aggregate par or face

value, no gain or loss shall be deemed to occur from the exchange, and the new stock or securities received shall be treated as taking the place of the stock, securities, or property exchanged.

"When in the case of any such reorganization, merger or consolidation the aggregate par or face value of the new stock or securities received is in excess of the aggregate par or face value of the stock or securities exchanged, a like amount in par or face value of the new stock or securities received shall be treated as taking the place of the stock or securities exchanged, and the amount of the excess in par or face value shall be treated as a gain to the extent that the fair market value of the new stock or securities is greater than the cost (or if acquired prior to March 1, 1913, the fair market value as of that date) of the stock or securities exchanged."

The main contention of the appellants is that this provision—excluding gain or loss in case of an exchange of securities through a reorganization—applies only to cases of voluntary reorganization, and does not apply to such cases as this, in which a creditors' bill and resultant receivership were incidents of the reorganization.

This contention calls for a brief outline of the Bay State reorganization.

In late 1917, the Bay State was in financial difficulties, perhaps insolvent. It was subject to mortgage indebtedness of some $17,000,000, besides a susbtantial amount of floating debt. It needed a radical reorganization. This began by a creditors' bill, assented to in behalf of the corporation, and the appointment of a receiver. Then followed mortgage foreclosure, and a judicial sale, at which the property was bid in for $3,600,000 only, and transferred to a new corporation, the Eastern Street Railway Company, organized under a special act enacted by the Massachusetts Legislature in 1918. This price bore no substantial relation, either to the outstanding indebtedness of over $18,-000,000, or to the real value of the property, as indicated by the issuance to the old stock interests of over $9,000,000 of new stocks. This goes far to indicate, if material, that this reorganization was a voluntary one. Committees were constituted to represent the various groups of security holders in the old enterprise; a leading Boston banking firm undertook the management of the reorganization. New cash was obviously necessary for working capital. The plan of reorganization, therefore, required, as a condition of sharing in the securities of the new company, the payment (in installments) as follows:

Bay State Street Railway preferred, $15.
Massachusetts Electric preferred, $10.
Massachusetts Electric common, $5.

Though voluntary, these cash contributions are commonly called assessments.

Sears elected to pay $10 per share on his 366 shares of Massachusetts Electric preferred, and received therefor on each share securities having the following values:

| Par Value. | | Market Value. |
|---|---|---|
| $10.00 | Refunding mortgage 5's, 1948............... | $ 7.00 |
| 2.00 | Adjustment Stock......................... | .48 |
| 25.00 | Option Warrants.......................... | 1.87 |
| 27.00 | Common Stock............................ | 5.40 |
| $64.00 | | $14.75 |

The owners of these Massachusetts Electric securities had, of course, their option either to pay their assessments and thus share in the new allotment, or to sell their rights and charge off as a loss the difference between the market value of their securities on March 1, 1913, and the sale price of their rights. The market value of Mr. Sears' rights in 1920 doubtless approximated to the difference between the market value of the new securities, $5,398.50, and his cash payment $3,660, or $1,738.50. He must have thought his right to participate worth more than this sum; otherwise he would not have paid the $3,660 and participated in the reorganization. What their later market value proved to be, we do not discover in this record.

Careful consideration of the able argument and the authorities cited by the petitioner's learned counsel fails to convince us that the Commissioner and the Board of Tax Appeals were wrong. We are unable to believe that Congress intended to distinguish between voluntary and (so-called) involuntary reorganizations, assuming for the moment that this reorganization is properly classed as involuntary. Reorganizations, without court proceedings, and generally a receivership, are rare, particularly in the case of public service corporations, that must continue to render service, however financially embarrassed. We think Congress must have used the word in its ordinary and generally accepted meaning. A "reorganization" is defined in Webster's New International Dictionary as: "The reconstruction or rehabilitation of a corporation, especially a railroad, usually affected compulsorily by a receivership and foreclosure."

Compare also Morawetz on Private Corporations, § 812. Bouvier's Law Dictionary contains a definition which, mutatis mutandis, describes this Bay State reorganization:

"Reorganization. A term in common use to denote the carrying out, by proper agree-

ments and legal proceedings, of a business plan for winding up the affairs of, or foreclosing a mortgage or mortgages upon the property of, insolvent corporations, more frequently railroad companies. It is usually by the judicial sale of the corporate property and franchises, and the formation, by the purchasers of a new corporation, in which the property and franchises are thereupon vested, and the stock and bonds of which are divided among such of the parties interested in the old company as are parties to the reorganization plan.

"In most of the states, statutes have been passed to regulate the purchase of corporate properties and franchises at judicial sales. They usually provide that the purchasers shall be, or become, or may organize a new corporation in taking over the assets and franchises purchased, and have and enjoy the corporate rights and franchises of the former company.

"Usually some of the security holders name a committee who formulate a plan of reorganization providing for the deposit of securities with the committee as agents or trustees for the owners; for the purchase of the property at the sale; and the organization of a new company upon the basis of a specified scheme of distribution of the new securities among those who assent to the plan. The securities are generally deposited with the committee with very full powers of control, under the plan, and usually with a certain power of modification of the plan, under specified circumstances. When the new company has been formed, the new securities are issued to the assenting parties in accordance with the terms of the plan."

Insolvent corporations are ordinarily either reorganized or liquidated. In liquidation, creditors and stockholders get cash. In reorganizations, however effected, they get new securities, or else sell their rights. Whether court proceedings of any kind are found to be a necessary or expedient means of effecting a reorganization, are, for present purposes, a distinction without a difference. So, also, is the qeustion whether the old security holders are required to make payments in cash in order to share in the securities of the successor corporation. The essential fact is that the right to share arises from a reorganization; the security holders cannot participate and still have a deductible loss under section 202(b). Mr. Sears elected to pay his assessment, thus taking his chances of recouping his immediate loss; for tax purposes he must be held also to have elected not to claim a loss. Compare United States v. Phellis, 257 U. S. 156, 42 S. Ct. 63, 66 L. Ed. 180; Rockefeller v. United States, 257 U. S. 176, 42 S. Ct. 68, 66 L. Ed. 186; Cullinan v. Walker, 262 U. S. 134, 43 S. Ct. 495, 67 L. Ed. 906; Weiss v. Stearn, 265 U. S. 242, 44 S. Ct. 490, 68 L. Ed. 1001, 33 A. L. R. 520; Marr v. United States, 268 U. S. 536, 45 S. Ct. 575, 69 L. Ed. 1079.

The decision of the Board of Tax Appeals is affirmed.