HELVERING, Commissioner of Internal Revenue, v. NEW PRESIDENT CORPORATION et al.

No. 11936.

Circuit Court of Appeals, Eighth Circuit.

July 14, 1941.

JOHNSEN, Circuit Judge, dissenting in part. ·

———◇———

Harry Marselli, Sp. Asst. to the Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty.

Gen., and Sewall Key, J. Louis Monarch, and Maurice J. Mahoney, Sp. Assts. to the Atty. Gen., on the brief), for petitioner.

George E. H. Goodner, of Washington, D. C. (Helen Goodner, of Washington, D. C., of counsel), for respondents.

Before GARDNER and JOHNSEN, Circuit Judges, and COLLET, District Judge.

COLLET, District Judge.

Two questions are presented for determination on this appeal from the Board of Tax Appeals.

First: Did the transactions involved herein constitute a corporate reorganization within the meaning of that term as applied to corporations under the Revenue Act,[1] with the result that the value of the property acquired by the successor corporation in the reorganization is to be considered at the value applied to that property in the hands of the predecessor corporation for the purpose of determining depreciation and profit or loss, or, is the value of the property to be determined as of the date of acquisition by the successor corporation without regard to the value at which it was held by the predecessor corporation?

Second: If the transactions involved did not amount to such a reorganization, was the market value of that property fixed by the figure at which it was purchased by the successor corporation at a foreclosure sale of the predecessor corporation's interest therein, or should it be fixed at the actual market value on the date of foreclosure?

1. The statute defines reorganization as follows:

"(i) *Definition of Reorganization.* As used in this section and sections 113 and 115—

"(1) The term 'reorganization' means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), or (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control

---

[1] Sections 112(a), (b) (3), (4), (5), (i) and 113(a) (7), (8) of the Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Acts, pages 511, 513, 514, 516.

of the corporation to which the assets are transferred, or (C) a recapitalization, or (D) a mere change in identity, form, or place of organization, however effected."

The property involved consists of real estate and a hotel building located thereon in Kansas City, Missouri. The building was constructed in 1926 at a total cost of $2,265,144.51. The company which owned and constructed the building was declared a bankrupt in 1926. On the property there was a first mortgage securing real estate gold notes totaling $883,000. Other creditors of the bankrupt company organized a corporation known as the President Hotel Corporation which purchased the property subject to the first lien of $883,000. The President Hotel Corporation paid the principal and interest on the first mortgage indebtedness from time to time so that on December 1, 1931, there was outstanding $682,000 of that indebtedness. The President Hotel Corporation defaulted in the payment of principal and interest on the first mortgage notes on December 1, 1931, and on January 1, 1932, defaulted in the payments due on a second mortgage, the amount of which at that time was $683,400. A receiver was appointed for the President Hotel Corporation at the instance of the second mortgage bondholders. The receiver operated the property until September 15, 1933.

After the default on the first mortgage indebtedness on December 1, 1931, a large majority of the first mortgage noteholders conceived the following plan: A new corporation designated as The New President Corporation was to be created; an agent was to petition the court in which the receivership action was pending for a foreclosure of the property under the first mortgage lien; the agent was to bid in the property for a price up to but not exceeding the amount of all first mortgage notes which should be pooled with the agent by such noteholders and should thereafter convey the title to the property acquired at the foreclosure sale to "The New President Corporation" in consideration of the transfer of the capital stock of that corporation to the noteholders in amounts proportionate to the face value of the notes pooled by each such noteholder. The new corporation was to hold the property until an advantageous sale could be made and then pass out of existence.

The court authorized the foreclosure and the entire arrangement was carried out as planned—the foreclosure occurring on September 7, 1933. The total face amount of the notes pooled with the agent prior to the foreclosure sale was $650,000.

The terms upon which the noteholders deposited their notes with the agent were incorporated in deposit agreements which were signed by the individual noteholders at the time each note was deposited, and contained, among others, the following authorization: "To purchase or cause to be purchased at any sale either in its name or in the name of the nominee or nominees the mortgaged property and in case of any such purchase, to use the notes deposited hereby in payment or part payment thereof."

The authorization to use the deposited notes in part payment for the mortgaged property implies that it was the understanding that the agent might pay more than the total amount of the deposited notes for the property. However, the testimony indicates that the agreements were construed as authorizing the agent to bid only the total amount of all deposited notes and accumulated interest. In view of all the circumstances, that construction appears to be the proper construction of the agreements.

On July 29, 1933, after the date of the foreclosure sale had been set for September 7th, the agent's representative wrote a letter[2] to all noteholders advising them that the time for depositing notes under the plan would close September 5th, 1933, and advised them that unless they deposited their notes before that date they would only be entitled to receive their pro rata share of the sale price of the property which might be a comparatively small percentage of the face value of the notes.

Although the agent was authorized by

---

[2] "There is enclosed herewith a letter from the agent under the Deposit Agreement, which, among other things, advises you of the fact that the agent has closed the time for regular deposit of notes on September 5, 1933. Unless thereafter the agent determines to accept special deposits, if you have not deposited your notes by that date you will only be entitled to receive your pro rata share of the proceeds from the foreclosure sale of the properties. The amount of this share depends entirely upon the amount bid at the sale and it may be a comparatively small percentage of the face value of your notes."

those noteholders to pay up to $650,000 plus accumulated interest for the property at the foreclosure sale, his first bid was $350,000 for the real estate and the building. That was the only bid and the property was sold to him at that price. The bid price was paid by the surrender of first mortgage notes in the principal amount of $350,000.

The agent with the authority of the pooling first mortgage noteholders settled with the noteholders who had not pooled their notes by paying them their pro rata part of the sale price of the mortgaged property. He also paid the expense of the foreclosure, the total outlay for both purposes amounting to $25,400.88. In addition, the agent purchased for the pooling noteholders the hotel furnishings for $50,000 and certain miscellaneous hotel equipment for $16,250.

The New President Corporation was created. The agent conveyed the title to the real estate, building, furnishings and miscellaneous hotel equipment to that corporation and the corporation transferred all of its capital stock to the pooling noteholders in amounts proportionate to the amount of notes held by each.

The Board of Tax Appeals found that the market value of the property on the date of the foreclosure, to-wit: September 7, 1933, was $650,000. The evidence is clear, convincing and undisputed that such was its market value on that date.

On March 31, 1937, The New President Corporation sold all of the property purchased by the agent and theretofore conveyed to it by him for a net consideration of $668,846.18, in cash. It made distribution to its stockholders, ceased doing business and proceeded to liquidate.

In its return The New President Corporation reported a net loss of $48,878.96 on the sale of all of its assets on March 30, 1937, but deducted only $2,000 of this amount from income as a loss upon sale of capital assets. The Commissioner determined that there was a profit of $239,-785.15 upon such sale, which amount he included in the income of the latter corporation and assessed a deficiency.

The deficiency determined by the Commissioner resulted from the disallowance of the cost basis of the assets for depreciation as claimed by the taxpayer for the taxable periods involved and also the inclusion by the Commissioner as income of the difference between the value as fixed by him and the sale price of $668,846.18. The value for annual depreciation purposes and the acquisition value determined by the Commissioner was fixed at the amount bid for the property at the foreclosure sale, to-wit: $350,000 plus certain additions.

The Board of Tax Appeals found that the acquisition of the property by The New President Corporation was in connection with a reorganization of the old President Corporation and used the old corporation's value for tax purposes as the basis for determining depreciation and profit.

There was no statutory reorganization. Prior to the decision of the Supreme Court in LeTulle v. Scofield, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. 355, it had frequently been held that under circumstances similar to those involved here, the acquisition by a new corporation organized and owned by bondholders of an old corporation after the equity of the old corporation in the property had been fully extinguished by depreciated values, could be characterized as a reorganization of the old corporation within the meaning of the Revenue Act, with the result that the valuation as fixed by and for the old corporation would be applied to the property in the hands of the new. De Blois v. Commissioner, 1 Cir., 36 F.2d 11(1); Commissioner v. Kitselman, 7 Cir., 89 F.2d 458(7), 461. In the latter case the court said: "It is clear that the bondholders were the moving spirit and were treated as the owners in fact, and it follows that they must be viewed as a class of 'stockholders' somewhat akin to preferred stockholders with cumulative dividend rights."

Again, in Commissioner v. Newberry L. & C. Co., 6 Cir., 94 F.2d 447, loc. cit. 449, quoting Helvering v. Minnesota Tea Co., 296 U.S. 378, 56 S.Ct. 269, 80 L.Ed. 284, the court used the following language: " 'that (although) the relationship of the taxpayer to the assets transferred was substantially changed (that circumstance) does not prevent the transaction from constituting a reorganization under the Act' * * *."

See, also, Commissioner v. Tyng, 2 Cir., 106 F.2d 55 (reversed, 308 U.S. 527, 60 S.Ct. 378, 84 L.Ed. 445, in memorandum opinion upon authority of LeTulle v. Scofield, supra).

In the LeTulle case the Supreme Court has effectively eliminated the theory

followed in the cases noted by holding that no reorganization may be contemplated absent a continuity of the same character of interest between the predecessor owner and the acquiring corporation. Peculiarly applicable to the facts in the present case is the ruling of the Supreme Court in the LeTulle case that the interest of a bondholder was that of a creditor as distinguished from a stockholder, with the result that the two interests were not of like character and could not be joined to create the continuous and continuing similar interest between the predecessor and acquiring owners which is a necessary incident to the theory of reorganization.

■ In the present case the ownership of the old President Corporation was completely and effectively terminated by the foreclosure sale. That interest was a stockholder's interest.' The interest which the noteholders acquired in the name of The New President Corporation was a bondholder's interest prior to the foreclosure sale and an interest of a purchaser at and subsequent to the foreclosure sale, hence under authority of LeTulle v. Scofield, supra, there was no statutory reorganization. See, also, Com'r of Internal Revenue v. Bondholders Committee, 9 Cir., 118 F.2d 511.

■ On the question of what value should be placed upon the property of the President Hotel Corporation acquired by the agent at the foreclosure sale in September, 1933, it has been heretofore noted that the agent of the pooling first mortgage noteholders purchased the assets of the old corporation at the sale for those noteholders and then conveyed all of the property to the new corporation which in turn transferred all of its stock to those noteholders in accordance with a pre-arranged plan. The purchase at the foreclosure sale was, therefore, actually a purchase by the pooling noteholders,—creditors of the old corporation, since it is of no. consequence that the agent was the conduit of the title.[3] The purchase at the foreclosure sale being for all intents and purposes a purchase by the creditors of the former owner, the question is whether its bid of $350,000 at the sale fixes the acquisition cost at that figure or will the fair market value of the property on the date of the sale be used as the cost for the purpose of

determining profit or loss at the subsequent sale on March 31, 1937. If the bid price controls, the Commissioner's deficiency assessment was proper.' If the market value controls, there was no subsequent profit and the Board's reversal of the Commissioner's assessment was correct for reasons which will be noted.

The method of determining the value of property purchased at foreclosure when the creditor purchases the mortgaged property is set out in Article 193 of Regulation 77, promulgated under the 1932 Revenue Act, and Article 23(k)–3 of Regulation 94 under the 1936 Act, as follows: "* * * Where the creditor buys in the mortgaged or pledged property, loss or gain is realized measured by the difference between the amount of those obligations of the debtor which are applied to the purchase or bid price of the property * * * and the fair market value of the property. The fair market value of the property shall be presumed to be the amount for which it is bid in by the taxpayer in the absence of clear and convincing proof to the contrary. If the creditor subsequently sells the property so acquired, the basis for determining gain or loss is the fair market value of the property at the date of acquisition."

The first part of the quoted regulation relates to the measurement of the gain or loss of the acquiring creditor for the year in which the sale occurred resulting from the conversion of his security into the acquired property. Illustrative of its possible application,—if the noteholders had only possessed notes having a total face value of $350,000, presumably if they acquired property therefor during the year 1933 having a fair market value of $650,000 they would have been charged with a profit for that year of $300,000. If, however, the creditors held $650,000 of secured notes for which they acquired property having a fair market value of only $350,000 we may assume for illustrative purposes that a loss would have been recognized. But we are not now determining the loss or profit of the noteholders for the year during which the conversion of their interest as noteholders into a fee interest occurred, and there is nothing in this record to indicate that the noteholders placed any value upon the property in 1933 for tax purposes which would preclude them from showing the fair market value

[3] Commissioner of Internal Revenue v. Newberry L. & C. Co., 6 Cir., 94 F.2d 447, loc cit. 449.

of the property on the date of its acquisition in this proceeding. We now seek to ascertain what profit, if any, inured to them in 1937 as a result of the sale of the fee in March of that year. This necessitates the application of the second portion of the quoted regulation, the ascertainment thereunder of the value of the property when acquired in 1933, and the comparison of that value with the sale price of that property in 1937. The Commissioner uséd the bid price as the fair market value of the property in 1933. The Board found that the fair market value of the mortgaged property at that time was $650,000.

■ It may be suggested that by bidding $350,000 and settling with non-pooling noteholders upon that basis, the pooling noteholders may not now assert a different amount as the market value. But the amount which the property brought at the foreclosure sale did not determine its market value since the sale price of property at a foreclosure sale is no criterion of market value. Weed v. Lyons Petroleum Co., D. C., 294 F. 725, loc. cit. 734; City of St. Louis v. Smith, 325 Mo. 471, 30 S.W.2d 729. And the fact that non-pooling noteholders only received their pro rata share of the bid price did not fix that price as the market value of the property. There was no contractual obligation between the pooling noteholders and those not pooling their notes which required the former to pay the latter their pro rata part of the market value of the mortgaged property in the event the former should be the successful bidder. Both had the same opportunity to bid. If either preferred to buy in the property upon the assumption that the market value was more than the highest bid at the forced sale and take the attending risk of being able to vindicate their judgment by later disposing of it at a price greater than the bid price, that was a right the exercise of which in no manner committed the purchaser to the theory that the bid price was the market value, or estopped him from later showing what the market value actually was at the date of the foreclosure. Nor is the fact that the pooling noteholders settled with the non-pooling noteholders upon the basis of the sale price at the foreclosure sale inconsistent with the former's present contention that the bid price was not the market value. The non-pooling noteholders were only en-

titled to receive their pro rata part of what the security brought at the forced sale. That is what they received and in no way did the pooling noteholders represent that what was being paid was a pro rata part of the fair market value of the property. The theory upon which the pooling noteholders bought the property was that it was worth more than it brought. That was their theory at the time of the foreclosure and it is their theory now.

■ Absent the regulation (Article 193 of Regulation 77, supra), the bid price at the foreclosure sale would be entitled to slight consideration in the determination of fair market value.[4] Only by the express terms of the regulation is the bid price made determinative of the fair market value at the date of acquisition, for tax purposes. But, as noted, the bid price is not made conclusive evidence of that value. It is only presumed to be the fair market value in the absence of clear and convincing proof of fair market value. Upon such proof the Board found the fair market value on the date of acquisition was $650,000. The regulation provides that when the property was subsequently sold the basis for determining gain or loss resulting from that sale is the "fair market value of the property at the date of acquisition." As the fair market value at the date of acquisition plus the cost of necessary additions to the property subsequent to acquisition and prior to its sale in 1937 exceeded the sale price, there was no profit derived from the sale in 1937. The decision of the Board should therefore be, and is, affirmed.

JOHNSEN, Circuit Judge (dissenting in part).

I agree with the majority that there was no such corporate reorganization here, as would entitle respondent to the benefit of the taxable basis or value of the hotel property in the hands of the previous owner. I am unable to agree, however, that the Board of Tax Appeals' decision may nevertheless be affirmed, because the evidence in the record indicates that the actual market value of the property at the time of the foreclosure sale was $650,000.

What the evidence in this proceeding may indicate the value of the property to have been in 1933 seems to me irrelevant to the real inquiry. The controlling ques-

---

[4] Majestic Securities Corporation v. Commissioner of Internal Revenue, 8 Cir., 120 F.2d 12, decided June 5, 1941.

tion, as I view it, is, what value was established upon the property for tax purposes, between the Commissioner and the bondholders, at the time they acquired title in the foreclosure proceedings.

Since obligations of the debtor were applied to the bid price of the property, the bondholders were required, under the Treasury Regulation set out in the majority opinion, to measure, during the then current tax year, the gain or loss which had resulted to them from the foreclosure purchase. This meant that the fair market value of the property had to be determined and established at that time. Presumptively, as to both the bondholders and the Commissioner, this value was the amount for which the property had been bid in. But neither the bondholders nor the Commissioner was conclusively bound by that figure, in the establishment of the value. Each was at liberty, in settling the question of tax liability, or the right to any loss deduction by reason of the purchase, to produce "clear and convincing evidence to the contrary." This right, however, had application only to a direct issue between the bondholders and the Commissioner on that question, and not to an inquiry in a collateral proceeding with the transferee, such as is here involved.

On the record before us, and under sections 112(b) (5) and 113(a) (8) of the Revenue Acts of 1932 and 1936, respondent clearly took the property on the same tax basis as the bondholders held it at the time of the conveyance. In the absence of any proof that a different basis was established by the bondholders for their 1933 tax liability, I think the only deduction permissible from the record is that the amount of the bid was allowed at that time to fix the value of the property for future tax purposes. Under the Treasury Regulations, the bid price was presumed to represent the fair market value of the property. In fairness, however, if some different tax basis was actually agreed upon between the Commissioner and the bondholders, I think the way should be left open to respondent to show this fact before the Board of Tax Appeals.

I do not regard the fact that the bondholders were willing to have bid $650,000, if necessary, in order to obtain the property, as of any significance, since there was clearly a selfish reason why this was not done. It would have required an additional cash advance on their part of approximately $15,000 in foreclosure proceeds, for distribution to the bondholders who were not parties to the depositary agreement.

The Board of Tax Appeals disposed of the case solely on the theory of a corporate reorganization. The cause should be remanded to it, for a determination of the basis on which the bondholders established the market value of the property for tax purposes in 1933, and of respondent's resulting tax liability by reason thereof.