WELLS FARGO BANK & UNION TRUST CO., as Executor of the Estate of Ivey L. Borden, Deceased, Appellant,

v.

UNITED STATES of America, Appellee.

No. 14270.

United States Court of Appeals Ninth Circuit.

June 16, 1955.

Rehearing Denied Sept. 6, 1955.

Arthur H. Kent, Valentine Brookes, San Francisco, Cal., James A. Cobey, Merced, Cal., for appellant.

H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Hilbert P. Zarky, Grant W. Wiprud, Meyer Rothwacks, Sp. Assts. to Atty. Gen., Lloyd H. Burke, U. S. Atty., Charles Elmer Collett, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before ORR, McALLISTER, and FEE, Circuit Judges.

McALLISTER, Circuit Judge.

Appellant, as executor of the estate of Ivey L. Borden, deceased, appeals from a judgment denying recovery for overpayment of federal excess profits taxes. The issue before us is whether a transaction in which a certain corporation, of which appellant's decedent, Mr. Borden, was sole stockholder, acquired the properties of a predecessor corporation of which he was also sole stockholder, constituted a tax-free reorganization. The district court held that it was not a tax-free reorganization within the meaning of Section 112(i) of the Revenue Act of 1932, 26 U.S.C.A.Int.Rev.Acts, page 513.

The background of the controversy is as follows: Mr. Borden, in 1929, was the individual owner of Victoria Island, with an area of 7,300 acres lying in the delta of the San Joaquin River in California. The land was subject to a reclamation district bond issue of $600,000, secured by the island. In 1929, Mr. Borden found it necessary to secure refinancing of the reclamation bond issue and, accordingly, organized I. L. Borden Company, a corporation, to which he transferred Victoria Island in exchange for all its capital stock less qualifying shares; and he induced the reclamation bondholders to exchange their bonds for bonds of the I. L. Borden Company of the same face value.

In 1932, the new corporation was receiving insufficient revenue from the

island to take care of the interest on the bonds, and refinancing was again necessary. Negotiations during that year between the corporation and West Coast Life Insurance Company resulted in an agreement that West Coast would make the necessary loan provided that the bondholders of the corporation be bought out, the deed of trust liquidated, and a new corporation formed to hold the island, which would allow West Coast a mortgage to secure the loan. In order to carry out this proposed agreement, a new corporation was organized under the name of Victoria Land Company. During the course of these events, Mr. Borden communicated with the bondholders of the I. L. Borden Company, offering to buy them out, and then later suggested that due to the financial condition of the island, the bondholders would either have to take the island over or proceed to a foreclosure sale.

The bondholders became convinced that the best way to salvage part of their investment was to proceed to foreclosure, and they, accordingly, notified the trustee under the bond indenture to give notice of default, to declare the principal due and payable, and to sell the island at public auction.

Mr. Borden planned with West Coast to buy the island at the foreclosure sale for $200,000, but, unexpectedly, a stranger appeared at the sale and entered the bidding, with the result that Mr. Borden and West Coast had to go up to $240,500 in order to outbid the stranger and to buy in the property. Thereupon, title to the property was forthwith transferred to the new Victoria Land Company, which held it during the tax years and until its dissolution in 1946.

Appellant's theory, on this review, is that, at the time of the foreclosure of the island property, its fair market value was in excess of the price at which it was sold at foreclosure; that this excess represented the equity in that property remaining in the Borden Company after the foreclosure, and was allocable to decedent as sole stockholder; that it was

this equity which was transferred by the Borden Company at that time to the Victoria Land Company in which decedent was also sole stockholder; and that, because of this, there was a tax-free reorganization rather than an outright sale of the property, and that appellant's decedent is, accordingly, entitled to recovery of overpayment of the federal excess profits taxes because of the tax-free nature of the transaction.

Section 112(i) of the Revenue Act of 1932, in so far as here pertinent, provides:

"(1) The term 'reorganization' means (A) a merger or consolidation (including the acquisition by one corporation of * * * substantially all the properties of another corporation), or (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, * * *."

There is no reorganization when the transferor does not acquire a proprietary interest in the purchasing company. Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428; Le Tulle v. Scofield, 308 U.S. 415, 60 S.Ct 313, 84 L.Ed. 355. The proprietary interest shifts from stockholders of a corporation to its creditors, not later than the time when the creditors take steps to enforce their demands against their insolvent debtor. In ascertaining whether there is a shift of proprietary interest from stockholder to creditor, the determining and controlling factors are the debtor's insolvency and an effective command by the creditors over the property. Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775. The legal procedure employed by the creditors is not material, but the critical facts are that the old corporation was insolvent and that its creditors took steps to ob-

tain effective command over its property. Palm Springs Holding Corp. v. Commissioner, 315 U.S. 185, 62 S.Ct. 544, 86 L.Ed. 785.

The district court found that when the first mortgage bondholders of the Borden Company demanded that the trustee under the trust indenture sell the property known as Victoria Island, which was security for their bonds, that company was insolvent in an equity sense. The mortgage was for $600,000. The sale at foreclosure brought $240,500. The district court found that $240,500 was the fair market value of the property at that time. One of the government expert witnesses testified that the fair market value of the property was $240,000; another testified that it was $240,500. Moreover, this was the amount paid as a result of competitive bidding at a public sale.

■■ It is strenuously maintained by appellant that the sale price on the foreclosure is no evidence of the value of the property as of that time, and in support of this contention, he cites Helvering v. New President Corp., 8 Cir., 122 F.2d 92. Under given circumstances, this may be true, but the authority above cited does not lay down such a rule as absolute in all cases. Many foreclosure sales are, in effect, closed sales where creditors buy in. Here, the public participated. The final price which was bid in the instant case was considerably higher than Mr. Borden represented the property could be sold for, and, as heretofore mentioned, resulted from the bidding of an outsider. Taking all of the circumstances of this case into consideration, we cannot say that it was error for the district court to consider, with other testimony, the sale price as some evidence of the fair market value of the property at the time of the sale. The findings of fact by the district court that the company was insolvent and that the fair market value of its property at the time of sale was $240,500 were fully supported by the record.

Appellant contends that the foreclosure was merely part of a plan of reorganization in which the bondholders followed the advice and direction of Mr. Borden in agreeing to such a proceeding.

It is claimed by appellant that the creditors merely acquiesced in Mr. Borden's plan to retain his proprietary interest; that he used their creditors' rights merely as a mechanism for effecting his plan and attaining his objective; and that, consequently, the creditors at no time took steps to obtain effective control over the property. It is difficult to understand how the creditors would agree to accept only one-third of the amount of their claims in order that Mr. Borden could profit so greatly at their expense; and there is assuredly no evidence that such was their understanding or intent. As the district court remarked, the fact that the alleged plan of reorganization did not make any reference to the purported equity remaining in the mortgagors, or provide for the transfer of such an important equitable interest to the new corporation in exchange for its capital stock, supports the government's view that no equitable interest remained in Borden.

The evidence shows, not a plan of reorganization, but, rather, various proceedings resorted to when Mr. Borden failed to refinance the outstanding bond issue. It is clear that the entire proprietary interest in the property of the corporation shifted from Borden, the sole stockholder, to the first mortgage bondholders when the latter took effective command over the disposition of the property prior to the foreclosure sale.

■ Since the fair market value of the property was equivalent to the price paid at the sale, there was nothing of value left in the Borden Company after the foreclosure allocable to decedent as sole stockholder, that the new company, of which Mr. Borden was also sole stockholder, received by way of transfer. The foreclosure had divested the Borden Company of whatever legal or economic interest it had in the property. The new company acquired from the Borden Com-

pany the property in question, solely for cash, at a foreclosure sale under a bond indenture. The old continuity of interest was broken; the bondholders acquired no interest in the new corporation; and Mr. Borden, who no longer possessed any interest in the property of the old corporation, became the sole stockholder and proprietor of the new corporation. It is plain that, under these circumstances, there was no tax-free reorganization within the meaning of the statute.

In accordance with the foregoing, the judgment of the district court, 115 F. Supp. 655, is affirmed in accordance with the opinion of Judge Roche.