### UNITED STATES v. GALVESTON-HOUSTON ELECTRIC CO.
### No. 3143.

Circuit Court of Appeals, First Circuit.
June 25, 1936.

Eugene O'Dunne, Jr., Sp. Atty., Bureau of Internal Revenue, of Washington, D. C. (Robert H. Jackson, Asst. Atty. Gen., Sewall Key and J. Louis Monarch, Sp. Assts. to the Atty. Gen., and Herman Oliphant, Gen. Counsel, Department of Treasury, of Washington, D. C., on the brief), for the United States.

Burton E. Eames, of Boston, Mass. (George M. Naylor, Jr., of Boston, Mass., Claude M. Houchins, of Washington, D. C., and Tyler, Eames, Wright & Reynolds, of Boston, Mass., on the brief), for appellee.

Before BINGHAM and WILSON, Circuit Judges, and MORRIS, District Judge.

WILSON, Circuit Judge.

The appellee petitioned for reorganization under section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. The United States

presented a claim for income taxes for the year 1931, amounting with interest to approximately $268,000.

The appellee is a holding company and its affiliated subsidiaries in 1931 were the Galveston Electric Company, hereinafter referred to as the Galveston Company, which at that time owned and operated the street railway and the electric light and power business in Galveston, Tex.; the Houston Electric Company, hereinafter referred to as the Houston Company, which in 1931 owned and operated the street railway and bus transportation and also the electric light and power business in Houston, Tex., and vicinity; the Galveston-Houston Electric Railway Company, hereinafter referred to as the Interurban Company, which in 1931 owned and operated an electric railway between Galveston and Houston, and also certain light and power properties, including power stations and transmission lines; the Hitchcock Ice & Storage Company, hereinafter referred to as the Hitchcock Company, which in 1931 owned and operated the electric light and power business in Hitchcock, Tex., and vicinity, and also the ice business in Hitchcock.

The Electric Company (the appellee) held all the stock of the four operating companies, and, in addition, certain obligations of each company.

The Electric Company in 1926 issued its secured gold notes in the amount of $3,200,000 under an indenture with the Atlantic National Bank of Boston as trustee. The obligations were secured by stocks and bonds of the above named subsidiaries pledged with the trustee, viz.: General mortgage bonds of the Galveston Company of the par value of $1,900,000; general mortgage bonds of the Houston Company of the par value of $350,000; general mortgage bonds of the Interurban Company of the par value of $1,600,000; and all the capital stock of the Interurban Company. The general mortgage bonds of the three subsidiaries, as well as the notes for which they were pledged as collateral, became due on June 1, 1931.

Early in the year 1931, it became apparent to the bankers who had sold these notes in 1926, and to the holders, that the Electric Company could not meet these obligations on June 1, and both the notes and the general mortgage bonds would be defaulted.

As a result the Boston bankers who sold the notes, selected a committee of responsible and representative men, who stand high in the financial affairs in Boston, to protect the interest of the holders of the notes. The committee organized in May, 1931, and called for a deposit of the notes, and soon had a large majority in amount placed in their hands to secure the most favorable terms they could for settlement.

With the approval of the committee the Electric Company in August, 1931, sold the electric light and power interests of the Galveston and Houston Companies, for which it obtained a sufficient sum to pay the first and general mortgages of the Galveston Company, and, in addition, a sum sufficient to pay approximately 60 per cent. of the secured gold notes due on June 1, 1931. By this sale there was a gain of $2,000,000 to the affiliated subsidiaries of the Electric Company.

The problem for the bankers committee then was, how it could protect the balance of 40 per cent. of the notes. The Electric Company during the period of depression had no means of raising further cash. The committee, after studying the situation, made a proposition to the Electric Company, which involved the sale at public auction, by the trustee named in the indenture under which the notes were issued, of the collateral held as security for the notes, by which sale there was a loss to the Electric Company of nearly $3,000,000.

The question presented is: The subsidiaries of the Electric Company having gained $2,000,000 by the sale of their electric light and power business, and the Electric Company having lost approximately $3,000,000 through the sale by the trustee of the collateral pledged to secure the secured gold notes, was there an income tax due the United States from the Electric Company by reason of the gain on the sale of the properties of its subsidiaries, they being affiliated companies, or can the Electric Company offset the loss resulting from the sale of the collateral pledged for security of the secured gold notes?

This question was referred to a special master, who reported the facts as follows:

"On September 18, 1931, the Noteholders' Committee submitted a Plan which was designed to bring about this result (viz: the payment of 60% in cash and the balance of 40% in secured obligations).

This Plan was prepared with great care and contains a mass of detail which may be omitted here. In brief the Plan provided:

"1. For the acceptance by the noteholders of 60% in cash from the proceeds of the sale already described.

"2. For the issue of new notes by the Company for the balance.

"3. For security behind the new notes which should include all the collateral left with the Trustee to secure the original notes as well as other substantial assets belonging to the debtor company.

"To provide for the security, mentioned in 3 above, the Committee undertook to cause a foreclosure of the original collateral still in the hands of the Trustee, by public auction and to bid in that collateral if it could be bought at a price which the Committee approved. If the Committee bought this collateral at the auction it undertook to convey it to a new corporation formed by the Committee.

"Through the instrumentality of this new corporation formed by the Committee, for this purpose, the new notes of the debtor company were to be secured. * * *

"The Trustee, holding collateral under the original pledge, arranged for a public auction, in accordance with all the terms of the Indenture of Trust. That auction was widely advertised. It was conducted by Wise, Hobbs & Arnold, who are well known auctioneers of such property, and bid in by the Committee at $112,000 without competition.

"Thereafter the Committee, and the Company proceeded to execute the Plan. This involved a mass of technical corporate proceedings, carried through with the most careful and intelligent consideration of all questions involved. The net result was to give the noteholders sixty cents in cash, and a new promise backed by practically everything the Debtor had. * * *

"It is conceded that the Parent Company, and its subsidiaries, constituted an 'affiliated group,' within the meaning of the Revenue Act of 1928, and as such was entitled to file a consolidated tax return in which the losses of any of the affiliated companies might be set off against the gains of the others, leaving only the balance of net income of the group subject to tax.

"Accordingly a consolidated return was filed for the period in question. A profit of about $2,000,000 was reported for the subsidiary companies, resulting from the sale of properties in August as already described. A loss of about $2,940,000 was reported for the Parent Company, resulting from the foreclosure sale of its securities pledged to secure the $3,200,000 note issue, already described. The loss of the Parent Company was set off against the gains of the subsidiaries, showing a net loss of about $900,000 and no tax. * * *

"The first thought in the minds of everybody was to pay off, or refinance the notes which fell due June 1, 1931. The Bankers anticipated trouble as early as February. The Debtor Company admitted its condition, and offered to assist. The Noteholders' Committee was organized in May. There was no tax problem in February and none in May. In the meantime the Bankers, the Committee and the Company, were busy on the single problem of paying these notes. No tax question arose until August, when the sale of subsidiary properties showed a profit. In my judgment the tax question which then arose was still incidental to the main objective. It is not denied that after the August sale the possibility of a tax was carefully considered by the Company and by the Committee. The Company hoped to continue operations and the Committee expected to be the Company's creditor for some time to come. Any proper reduction in taxes would benefit each of them. I have no doubt that the Committee and the Company, then and there determined to employ any legal means by which taxes could be reduced or avoided, so long as the means employed were consistent with complete protection for the Noteholders."

The government argued before the master that the committee was dominated by the company, but the master found that "Such a claim is unjustified. The Committee was intelligent and independent. It was friendly without being subservient. The Committee knew what it wanted and knew to what extent the Company could respond. The Company realized that, and its representatives made every possible effort to satisfy the Committee."

The government further argued before the master that this whole complicated procedure was a subterfuge, conceived and executed by the debtor company for the sole purpose of evading a just tax; that the sale of the pledged securities, which is

the basis of the loss claimed, was unfairly conducted, as a part of the general conspiracy to evade a tax.

The master found, however, that "The sale was conducted in strict compliance with the terms of the Indenture. It was advertised in leading papers in Boston, Chicago and New York, on four different dates. The terms were clear and reasonable. The auction was conducted by a recognized auctioneer in a perfectly normal and fair manner. There was no other bidder than the Committee. The reason is obvious, the securities sold were defaulted second mortgages, junior to first mortgages then selling in the open market at about thirty cents on the dollar. These securities had no value except for trouble making purposes. The price paid by the Committee was $112,000, which under the circumstances was fair."

The government also contended that the company has sustained no loss which can be computed from some closed transaction or identifiable event; but the master found that "On this issue the Company did suffer a clear loss subject to exact computation as a result of the foreclosure sale by the Noteholders' Committee. This sale, as I have already stated, was conducted in good faith and was entirely beyond the Company's control."

In addition to the findings of the master, certain facts were stipulated by the parties relating to the order and date of the several later steps in executing the plan.

Upon the facts found by the master and stipulated by the parties, the District Court said:

"It is clear that in the course of the plan to pay off a part of the issue and refund the balance, both gain and loss resulted. The value of certain securities hypothecated as security for the secured notes had unquestionably decreased in value to an extent sufficient to wipe out any gain that may have resulted from the sale of other assets, the proceeds of which were used to retire 60 percent of the issue.

"There was a sale of these hypothecated securities at public auction conducted by the trustee holding the securities as collateral. It would naturally be supposed that the extent of the loss could best be fixed by such a sale which the master has found was honestly and fairly conducted and widely advertised. It would seem only fair and equitable that the loss so established be deducted. I have no doubt the debtor is entitled to the deduction, unless it must be held as a matter of law, upon the facts submitted, that the transaction comes within some provision of section 112 of the Revenue Act of 1928 (45 Stat. 816, see 26 U.S.C.A. § 112 and note). Rose v. Trust Co. of Georgia (C.C.A.) 77 F. (2d) 355; Edison Securities Corporation v. Commissioner, 29 B.T.A. 483.

"It is the contention of the government that 112 (b) (4) [26 U.S.C.A. § 112 and note] applies. These provisions are that no gain or loss shall be recognized if a party to a reorganization exchanges property in pursuance of a plan of reorganization solely for stock or securities in another corporation, a party to the reorganization. It is urged that the principal debtor and the new corporation were parties to a 'reorganization,' as that term is defined in (i) (1) (B) of said section 112, 26 U.S.C.A. § 112 (g) (1) (B) note, which provides that the term 'reorganization' means 'a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred.'

"Assuming, for the sake of argument, that all the steps taken by the debtor and its affiliates were part of a single plan to pay off indebtedness in part and refund as to the balance, there was in my opinion no reorganization within the meaning of that term, because the transferor was not in control of the corporation to which the hypothecated securities were transferred by the committee for bondholders who purchased them at the foreclosure sale. As part consideration for the transfer, 2,000 shares were issued to the committee who still hold them. The fact that later the new corporation issued 32,000 shares to the debtor for other assets does not bring the transactions within the definition of reorganization.

"Furthermore, if we assume the old and new corporations were parties to a 'reorganization,' the facts do not warrant the conclusion that there was an exchange of property solely for stock or securities in the new corporation."

The District Judge confirmed the master's report. We think his conclusion was right. The committee did not start with any view of taking steps to avoid taxes. It does not appear that they had any plan in mind at the outset by which the Elec-

tric Company could obtain any cash to pay the committee 60 per cent. of the notes deposited with them. It developed that the Electric Company could dispose of its electric light and power interests for sufficient cash to discharge the first mortgage and a general mortgage of the Galveston Company, and leave sufficient funds to pay 60 per cent. of the secured gold notes deposited with the committee or outstanding. The committee then set about to devise means to obtain such security as they could for the balance of 40 per cent. The plan eventually involved the issuing of secured income notes in two series of the total par value of $1,280,000 by the Electric Company to replace the remaining 40 per cent. of the secured gold notes held by the committee.

There were clearly several distinct steps to be taken in the plan proposed by the committee, viz.: The sale by the trustee under the indenture; the organization by the committee of a new corporation, and the transfer of the securities purchased at the sale to the new corporation in exchange for 2,000 shares of its capital stock, a demand note and cash; and, finally, the issuing of new secured income notes by the Electric Company, and their distribution by the committee among the holders of the secured gold notes deposited with the committee, secured by such assets as the Electric Company could furnish, including $672,000 7 per cent. secured income bonds of the new corporation, 32,000 shares of its capital stock, and an equitable interest in the capital stock of certain of its subsidiaries.

The secured income bonds of the new corporation were, in turn, secured by 8 per cent. secured income bonds of the subsidiaries of the Electric Company obtained by the new corporation through an exchange of securities with the subsidiaries, which do not affect the question here. These new or substituted securities, however, in no way restored to the Electric Company the $3,000,000 it lost by the sale at auction of the defaulted securities pledged as collateral for the secured gold notes.

The Electric Company accepted the proposition of the committee. It was in their hands so far as a sale by the trustee was concerned. The sale was a perfectly legal transaction, even though the action was taken with a view to avoid an income tax. Bullen v. State of Wisconsin, 240

U.S. 625, 630, 36 S.Ct. 473, 60 L.Ed. 830; Jones v. Helvering, 63 App.D.C. 204, 71 F.(2d) 214, 217; Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355.

In the case of Bruce v. Helvering, 64 App.D.C. 192, 76 F.(2d) 442, 444, it was suggested that the case might be different if certain transactions had been designed to defeat the payment of income taxes, but the court said that there was in that case no suspicious circumstances suggesting that what was done was a sham. The sale on the one hand, and the exchange on the other, stand on the admitted facts separate and apart; and as the Supreme Court has said time and again in such circumstances: "The correct rule is to give effect to what actually was done, for that, after all, is the test." See Weiss, Collector, v. Stearn, 265 U.S. 242, 245, 44 S.Ct. 490, 68 L.Ed. 1001, 33 A.L.R. 520.

It is not contended that the sale by the trustee in this case was not conducted strictly in accordance with the terms of the indenture. It was widely advertised. The sale was conducted by a recognized auctioneer in a perfectly normal and fair manner. It was open to any competitor to come in and bid. There could be no sham about such a sale. The fact that the committee based its proposal upon its being the successful bidder did not stamp it as a sham. The plan proposed by the committee could not be carried through unless it acquired the pledged securities. If some other bidder acquired the pledged securities, which it was recognized, if done, might cause trouble for the Electric Company, the committee could not then rely on its plan being carried out and protect the holders of the notes. It did not control all the outstanding secured gold notes. The pledged securities, except by a sale by the trustee at a public auction, and a conveyance by the purchaser, could not be transferred without the consent of all the holders of the notes.

While the proposal made by the committee was made as a plan for "reorganization" of the Electric Company, it did not contemplate a reorganization within the definition of the 1928 taxing statute, which provides in (i) (1) (B) of section 112 that a reorganization means a transfer by a corporation of all or part of its assets to another corporation, if immediately after the transfer the transferor or its stockholders or both are in control of the cor-

poration to which the assets are transferred. It is conceded, we understand, that subdivisions (i) (1) (A) of that section, 26 U.S.C.A. § 112 (g) (1) (A) note, do not apply to the facts here; and if there was a merger or consolidation of the new corporation with the Electric Company within the meaning of section 112 (i) (1) (A) by the final acquisition of a majority of its voting stock, it was done later and by a separate, independent transaction after the loss was incurred. Ballwood Co. v. Commissioner, 30 B.T.A. 644, 651; Simms v. Commissioner, 28 B.T.A. 988, 1010, 1013; Mullins v. Commissioner, 14 B.T.A. 426, 433, 436.

■ The sale by the trustee of the pledged assets at public auction at which any competitor might bid, and then a conveyance to the new corporation, cannot be regarded as a voluntary exchange by the Electric Company of a part of its assets with the new corporation for its capital stock under (i) (1) (B) of section 112. These assets were transferred while the committee was in control of the new corporation through ownership of all its outstanding capital stock. While a part of its plan for protecting the noteholders, it was a separate, independent transaction and a proper action under the indenture, from which a definite and calculable loss resulted. Shoenberg v. Commissioner (C.C.A.) 77 F.(2d) 446, 448; United States v. S. S. White Dental Co., 274 U.S. 398, 401, 47 S.Ct. 598, 71 L.Ed. 1120.

It is agreed that, even if there were a reorganization under section 112, no gain or loss results, if the transaction falls within one of the five numbered subparagraphs of subsection (b) of that section; Rose v. Trust Co. of Georgia (C.C.A.) 77 F.(2d) 355; but it is further agreed by the government that the facts in this case do not fall under any one of the five subparagraphs, unless under subparagraph (4) which provides: "No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization."

Subparagraph (4), however, applies to voluntary exchanges by one corporation for stock or securities in another, presumably at a fair valuation of both. Here there was a bona fide sale over which the Electric Company had no control. The title and control over the collateral passed absolutely to the purchaser. A sale clearly does not comply with the language of subparagraph (4), Pinellas Ice Co. v. Commissioner, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428. The loss sustained, therefore, should be recognized in computing an income tax. See sections 111, 112(a) of the 1928 Act, 45 Stat. 816, 26 U.S.C.A. §§ 111, 112 and notes.

It is true that under the taxing statutes substance rather than form is considered; but as the courts have often said: "Income tax liability must be determined by what actually takes place, rather than by what might have taken place." Hoult v. Commissioner, 24 B.T.A. 79; Clemmons v. Commissioner (C.C.A.) 54 F.(2d) 209, 211. In Mullins v. Commissioner, supra, a member speaking for the Board said, 14 B.T.A. 426, at page 434:

"Speaking generally, in determining what was actually done in any case, this Board will regard substance rather than form. However, material and essential facts will not be dismissed or put aside as mere matters of form simply because they are related to and are steps in a comprehensive plan of reorganization, or together constitute a method for the attainment of a single desired result. * * *

"The fact that these several transactions together comprised a single plan of reorganization does not render them any the less separate and distinct undertakings. The nature of each transaction is determinable from the facts relating to it, and is not changed because of its association with other transactions in a larger and more comprehensive plan."

The cases of De Blois v. Commissioner (C.C.A.) 36 F.(2d) 11; C. H. Mead Coal Co. v. Commissioner (C.C.A.) 72 F.(2d) 22; Securities Co. v. Commissioner (C.C.A.) 64 F.(2d) 330; Cortland Specialty Co. et al. v. Commissioner (C.C.A.) 60 F.(2d) 937, and Shoenberg v. Commissioner, supra, as to its result, cited in the government's brief, may be distinguished from this case on the facts.

■ The special master found as facts that the sale of the pledged securities by the trustee was an independent transaction made in good faith and that the price paid by the committee was fair and adequate. His findings were confirmed by the District Court. The evidence on which the master made his findings is not reported, and unless his findings were clearly errone-

ous as a matter of law, they will not be disturbed by this court. Maners v. Ahlfeldt et al. (C.C.A.) 59 F.(2d) 938; In re Henry Duffy Players (C.C.A.) 50 F.(2d) 737, 738; Prosser v. Chapman (C.C.A.) 2 F.(2d) 134; Helvering v. Ward (C.C.A.) 79 F.(2d) 381, 383, 384.

The order of the District Court is affirmed.